**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**

--------------------------------------------------

BAYRAM SAHIN,

      Petitioner,

       -vs-

UNITED STATES OF AMERICA,

       Respondent.

--------------------------------------------------

**Criminal Docket No.: 99-CR-530**

**Civil Docket No.:**  8:13-CV-0358 (GLS/RFT)

**PETITION FOR WRIT OF ERROR**
**CORAM NOBIS**

    Petitioner, Bayram Sahin ("Petitioner"), by and through Counsel, Raymond Lahoud of Baurkot & Baurkot, hereby Petitions that this Court issue a Writ of Error Coram Nobis, vacating his plea, conviction and sentence, entered on the 14th day of October, 1999, before this Court in the captioned Docket.

    Should the Court require additional evidence prior to entering a decision on Petitioner's Matter, Petitioner requests that this Court conduct an evidentiary hearing.

    In support of his Petition, Petitioner states what follows.

**I.    FACTUAL AND PROCEDURAL HISTORY**

    **a.    Prior and Subsequent to Petitioner's Plea and Sentencing**

    Petitioner is an adult individual who is currently residing in Turkey.  See Exhibit A (Affidavit).  He first entered the United States on July 29, 1997 as an immigrant.  See Exhibit B (Notice to Appear issued by the Department of Homeland Security ("DHS")).  On October 13, 1999, Petitioner, and his brother, Osman Sahin ("Osman"), were encountered at Malone, New

York and questioned by Customs and Border Patrol ("CBP") officials.  See Exhibit C (Record of Deportable Alien issued by DHS).  CBP officials only questioned Petitioner and Osman briefly and let them continue on their way.  Id.  At this time, only Petitioner and Osman were driving together.  Id.

Later that same day, the vehicle in which Petitioner and Osman were riding was noticed driving southbound on Route 30, away from Malone, New York.  Id.  The vehicle now contained three (3) individuals.  Id.  The three individuals—Petitioner, Osman and a third male of Turkish nationality—were stopped and were taken into custody.  Id.  All three remained in custody.  Id.

On October 14, 1999, the very next day, Petitioner was charged by an Information filed with this Court of violating Section 1324(a)(2)(a), Title 8 of the United States Code, which states:

> [a]ny person who, knowing or in reckless disregard of the fact that an alien has not received prior official authorization to come to, enter, or reside in the United States, brings to or attempts to bring to the United States in any manner whatsoever, such alien, regardless of any official action which may later be taken with respect to such alien shall, for each alien in respect to whom a violation of this paragraph occurs—be fined in accordance with title 18 or imprisoned not more than one year, or both . . . .

See Exhibit D (Information).  The Information alleged that Petitioner and Osman "knowingly, willfully, intentionally and unlawfully [brought] to the United States, Yusuf Cakmak, an alien, knowing and in reckless disregard of the fact that such alien had not received prior official authorization to come to, enter or reside in the United States."  Id.  On the same day that the Information was filed – less than twenty four (24) hours after he was arrested and interrogated for hours throughout the night of October 13, 1999 and into the morning of October 14, 1999, despite being unable to speak English or get any sleep while in federal custody – Petitioner consented to proceed before a United States Magistrate Judge, waived his right to a lawyer,

agreed to proceed pro se, waived his right to a jury trial, waived his right to a trial, agreed to enter a guilty plea, appeared before a United States Magistrate Judge, entered a guilty plea, again waived all of his rights, made an "all-out" allocution, refused free legal assistance, agreed to be sentenced, waived his right to any appeal and was sentenced.  See Exhibits A, E (Consent to Proceed Before United States Magistrate Judge and Waivers), F (Judgment Order) & G (Transcript of Plea and Sentencing).  A case that would normally take months, if not years, to complete, took only a few hours for Petitioner, an uneducated, non-English speaking immigrant from Turkey.  Id.

On October 14, 1999, at approximately noon, Petitioner appeared, together with an interpreter and Osman, before the Honorable Judge Henry C. Van Acker, Jr. ("Judge Acker").  See Ex. G.  At this hearing – the first and only hearing related to the charges levied against bother Petitioner and Osman – both pleaded guilty to violating Section 1324(a)(2)(a), Title 8 of the United States Code, were sentenced to a term of imprisonment of thirty (30) days and were not fined or required to serve any probationary period following their release.  See Ex. G.  Petitioner served his sentence and was released from federal custody.

On November 19, 1999, removal proceedings were commenced against Petitioner.  See Ex. A.  Petitioner appeared before the Immigration Court at Hartford, Connecticut on January 25, 2000.  See Exhibit H (Transcripts of Removal Proceedings).  Petitioner was charged as being removable pursuant to Section 237(a)(1)(E)(i) of the Immigration and Nationality Act (the "INA" or the "Act"), which states, in pertinent part:

> Any alien who (prior to the date of entry, at the time of any entry, or within 5 years of the date of any entry) knowingly has encouraged, induced, assisted, abetted, or aided any other alien to enter or to try to enter the United States in violation of law is deportable.

See Ex. A.   This charge of removability was the direct result of the federal conviction (Petitioner's plea and sentencing) before this Court.   See Ex. H.  Petitioner was not in custody of any federal agency when appearing before the Immigration Court.   Id.

On October 24, 2000, the Immigration Court found Petitioner removable as charged by DHS and order him removed to Turkey.   Id.   Petitioner's immigration counsel reserved Petitioner's right to appeal.   Id.  Petitioner timely appealed to the Board of Immigration Appeals (the "BIA" or the "Board").   See Exhibit I (BIA Case Appeal Docket Sheet).   On September 26, 2002, the Board affirmed the Immigration Court's decision.   Id.  A petition for review was filed with the Second Circuit Court of Appeals on October 18, 2002.   See Exhibit J (Second Circuit Docket Sheet).   On April 14, 2005, the Petition for Review was dismissed by the Second Circuit Court of Appeals.   Id.

In 2012, years after his plea, sentencing and the entry of a removal order, Petitioner was taken into DHS custody, separated from his family, friends and community.  Rather than deport Petitioner in 1999, 2000, 2001, 2002, 2003, 2004, straight through to the time the Second Circuit Court of Appeals dismissed his Petition for Review, DHS waited nearly a decade from the date of Petitioner's minor conviction and more than five years from the date the Second Circuit dismissed his Petition for Review, to actually execute the removal order entered by the Immigration Court in Hartford, Connecticut on October 25, 2000.   Now, Petitioner sits in Turkey, afraid for his life and his family, and suffering the consequences of a plea, unlawfully entered at proceedings that fell well short of providing due process, made more than a decade ago.

**b.     Petitioner's Plea and Sentencing: Thirty Minutes of Errors**

At noon on October 14, 1999, Petitioner appeared with his brother, Osman, before Judge Acker.  This appearance was less than twenty four (24) hours from their initial arrest.  Both Petitioner and Osman appeared pro se.  This hearing was riddled with substantive errors.  At the outset, Judge Acker conducted the hearing in a "nonchalant" manner, spelling Petitioner's name incorrectly and, minutes later, conceding that he could not identify which defendant was Petitioner and which Osman.

Judge Acker presented Petitioner with an English-only copy of the charges that had been levied against him, and told the interpreter to let Petitioner and Osman know what they stood charged with.  Judge Acker then told Petitioner and Osman that "they're accused of trying to help Mr. Cakmak, the other gentleman who was here, to enter the United States illegally yesterday."  (Tr. at 2).  This was the extent of the discussion of the charges – Judge Acker failed to discuss the specific elements of the crime charged and the requirement of mens rea.  Moreover, there is only one instance in which the transcript of the arraignment indicates that anything was translated to Petitioner: after Judge Acker stated that they had been "arrested for violating the laws of the United States," there is note that this was translated to Respondent and Osman; nowhere else is it definitively noted that anything was translated.  (See generally Tr.).

Judge Acker hurried through the rest of the hearing, ignoring moments that should have given him great pause and demanded that he either seek or issue clarification on a number of issues.  Judge Acker told Petitioner and Osman that they had a right to plead guilty and a right to a lawyer.  Immediately thereafter, Judge Acker emphasized the potential penalties: "[i]f they are found guilty, the maximum they could receive is a year in jail and a fine of $100,000.  A lawyer for the government recommends that if they say they're guilty today, they would receive a jail

sentence of 30 days." (Id. At 2).  Never did Judge Acker indicate the minimum penalty allowed under the statute.  (See generally id.).  Judge Acker asked if the interpreter went over the consent forms with Petitioner and Osman.  After the interpreter said that he did and told Judge Acker Petitioner and Osman would plea guilty, the interpreter and Judge Acker proceeded to converse in English:

| | |
|---|---|
| **THE INTERPRETER:** | He ask me the question, I'll have to tell you, your Honor, he says can one of us be free and the other one take the sentence?  I said were you together?  And he said yes. |
| **THE COURT:** | Well, it's a good question, but the answer is no.  So, once again, if they wish to say they're guilty, I'm going to ask them to sign those forms. |

(Id. at 2).  Then, Judge Acker asked the interpreter if "they" understood why they were arrested, the interpreter said they did, and the judge accepted their guilty pleas.  There is no indication that the interpreter actually interpreted what Judge Acker was saying; he may have simply been answering the court's questions based upon his assumptions as to Petitioner and Osman would say.  This hearing was riddled with clear errors, necessitating this Court's review as to whether Petitioner's due process rights were even interpreted, let alone protected.

Petitioner continues to claim that he would not have pled guilty had he been advised, in his language, in a proper manner, his rights.  Further, since that very day, Petitioner contends that he did not commit the acts required to violate the law under which he was convicted.  See 8 U.S.C. Sec. 1324(a)(2)(a).

## II.   JURISDICTION

Jurisdiction is properly laid in this District.  The District Court for the Northern District of New York had original jurisdiction in Petitioner's criminal matter.  Petitioner was charged by

the United States Attorney for the Southern District of New York, entered a plea of guilty before this Court and was sentenced by this Court.  This Court, therefore, has jurisdiction with respect to the granting of this Petition:

> [a]s a historical matter, the writ of <u>coram nobis</u> was used by a court to correct its own errors. The term <u>coram nobis</u>, defined in <u>Black's Law Dictionary</u> as 'before us,' comes from the phrase 'error <u>quae coram nobis resident</u>,' which means, literally, an error 'which remains in our presence.'  Thus, at common law, the writ was used by a court in cases within its own jurisdiction, not to correct errors in other jurisdictions.

<u>Finkelstein v. Spitzer</u>, 455 F.3d 131 (2d Cir. 2006) (internal citations omitted).  The Supreme Court has noted that the writ of error <u>coram nobis</u> "has been used, in the United States, with and without statutory authority but always with reference to its common-law scope."  <u>Morgan</u>, 346 U.S. at 508.  The <u>All Writs Act</u>, from which the federal courts derive their power to issue writs of error <u>coram nobis</u>, provides that "[t]he Supreme Court and all courts established by Act of Congress may issue all writs necessary or appropriate in aid of their respective jurisdictions and agreeable to the usages and principles of law," 28 U.S.C. § 1651(a).

The text of the statute clearly vest jurisdiction in this Court.  <u>Id</u>.; <u>see also</u> <u>Booker v. Arkansas</u>, 380 F.2d 240, 244 (8th Cir.1967) (holding that "[r]elief by the writ . . . is available, if at all, only in the court which rendered the judgment under attack"); <u>Thomas v. Cunningham</u>, 335 F.2d 67, 69 (4th Cir.1964) (stating that "[e]rror <u>coram nobis</u> . . . cannot issue under the instant proceeding... for the judgments are not in the court" where the petition was filed); <u>Lowery v. McCaughtry</u>, 954 F.2d 422, 423 (7th Cir. 1992) (holding that petitioner's "counsel conceded that she had not found even one decision in the history of the United States using <u>coram nobis</u> to set aside a judgment rendered by another court.").

### III.    ARGUMENTS

#### a.    The Writ of <u>Coram</u> <u>Nobis</u> is Petitioner's Only Available Relief

The ancient common law writ of error <u>coram</u> <u>nobis</u> survives by way of the <u>All</u> <u>Writs</u> <u>Act</u>. <u>See</u> 28 U.S.C. § 1651(a); <u>see</u> <u>also</u> <u>Morgan</u>, 346 U.S. 502 at 511.  The writ is an extraordinary remedy available under compelling circumstances to address errors of the most fundamental nature. <u>See</u> <u>Morgan</u>, 346 U.S. at 511-12.  "<u>Coram</u> <u>nobis</u> is not a substitute for appeal, and relief under the writ is strictly limited to those cases in which errors . . . of the most fundamental character have rendered the proceeding itself irregular and invalid." <u>Foont v. U.S.</u>, 93 F.3d 76, 78 (2d Cir.1996).

The <u>All</u> <u>Writs</u> <u>Act</u> is a residual source of authority to issue writs not otherwise authorized by statute.  <u>See</u> <u>Carlisle v. United States</u>, 517 U.S. 416, 428-29, 116 S.Ct. 1460, 134 L.Ed.2d 613 (1996).  When a particular issue is addressed by statute, it is that statute, not the <u>All</u> <u>Writs</u> <u>Act</u>, which controls.  <u>See</u> <u>id</u>. As for the continued significance of the writ in contemporary criminal proceedings, it has been said that "it is difficult to conceive of a situation . . . where [a writ of <u>coram</u> <u>nobis</u>] would be necessary or appropriate."  <u>Carlisle</u>, 517 U.S. at 429, 116 S.Ct. 1460 (internal quotation marks omitted); <u>see</u> <u>also</u> <u>Morgan</u>, 346 U.S. at 512, 74 S.Ct. 247 (holding that when "no other remedy being then available and sound reasons existing for failure to seek appropriate earlier relief, this motion in the nature of the extraordinary writ of <u>coram</u> <u>nobis</u> must be heard by the federal trial court"); <u>Fleming v. United States</u>, 146 F.3d 88, 89-90 (2d Cir.1998) (stating that "<u>coram</u> <u>nobis</u> is essentially a remedy of last resort for petitioners who are no longer in custody pursuant to a criminal conviction and therefore cannot pursue direct review or collateral relief by means of a writ of habeas corpus.").

Coram nobis is not a substitute for appeal, and relief under the writ is strictly limited to those cases in which "'errors . . . of the most fundamental character'" have rendered "'the proceeding itself irregular and invalid.'"   United States v. Carter, 437 F.2d 444, 445 (5th Cir.) (per curiam) (quoting United States v. Mayer, 235 U.S. 55, 69, 35 S.Ct. 16, 19-20, 59 L.Ed. 129 (1914)), cert. denied, 403 U.S. 920, 91 S.Ct. 2238, 29 L.Ed.2d 698 (1971).  A district court may issue a writ of error coram nobis pursuant to the All Writs Act, 28 U.S.C. § 1651(a), where "extraordinary circumstances are present." Nicks v. United States, 955 F.2d 161, 167 (2d Cir. 1992). The proceedings leading to the petitioner's conviction are presumed to be *79 correct, and "the burden rests on the accused to show otherwise."  Morgan, 346 U.S. at 512, 74 S.Ct. at 253, 98 L.Ed. at 248; Nicks, 955 F.2d at 167. A petitioner seeking such relief must demonstrate: (1) that there are "'circumstances compelling such action to achieve justice,'" id. at 167 (quoting Morgan, 346 U.S. at 511, 74 S.Ct. at 252-53);  (2) "sound reasons exist [ ] for failure to seek appropriate earlier relief,"  Morgan, 346 U.S. at 512, 74 S.Ct. at 253;  and (3) the petitioner "continues to suffer legal consequences from his conviction that may be remedied by granting of the writ," Nicks, 955 F.2d at 167.

Before this Court reaches the three question test, Petitioner must overcome the custody question.  Here, Petitioner has already served the entirety of his sentence and probationary period.  While Petitioner contends that his being subject to deportation and his time in Turkey was and continues to be a part of a sentence, for purposes of this Petition, he is not in any type of "official custody," such as supervised release or probation.  See Scanio v. United States, 37 F.3d 858, 860 (2d Cir.1994).  There is no other remedy, statutory or other, to vacate or correct the sentence illegally imposed and the guilty plea illegally gotten that displaces the common law writ. Carlisle, 517 U.S. at 428-29, 116 S.Ct. 1460.  If Petitioner remained in custody, the writ

would be unavailable.  See, e.g., United States v. Mandanici, 205 F.3d 519, 524 (2d Cir. 2000) (holding that coram nobis is "essentially a remedy of last resort for petitioners who are no longer in custody pursuant to a criminal conviction") (internal quotation marks omitted); United States v. Monreal, 301 F.3d 1127, 1132 (9th Cir.2002); United States v. Torres, 282 F.3d 1241, 1245 (10th Cir.2002); United States v. Johnson, 237 F.3d 751, 755 (6th Cir.2001).

As noted, Petitioner is not in official custody.  Given this, any relief under Section 2255 or the other habeas provisions are unavailable, as they require that Petitioner be in "custody." Absent other statutory relief, Petitioner, as a threshold matter, may proceed how he now does.

Petitioner must further demonstrate: (1) that there are "'circumstances compelling such action to achieve justice,'" Morgan, 346 U.S. at 511, 74 S.Ct. at 252-53; (2) "sound reasons exist [ ] for failure to seek appropriate earlier relief," Morgan, 346 U.S. at 512, 74 S.Ct. at 253;  and (3) the petitioner "continues to suffer legal consequences from his conviction that may be remedied by granting of the writ," Nicks, 955 F.2d at 167.  Petitioner clearly meets all three requirements.

The circumstances surrounding this Petition are sufficiently compelling so as to warrant action in the interest of achieving justice.  Morgan, 346 U.S. at 511.  Here, the circumstances are dire and will continue until Petitioner's death: deportation from the United States and living in exile in Turkey, away from one's family, friends and community.  Further, the due process concerns Petitioner's raises in the instant Petition are great and strike at the very heart of the American justice system.  He was a man that was rushed through the process in both his criminal and immigration related prosecutions.  He was not properly advised of his rights and the consequences of his plea and how his 1999 plea was certain to affect him for the rest of his life, as opposed to the thirty (30) days that he was originally sentenced to serve in confinement.

When taken as a whole, the facts surrounding Petitioner's claims and the continuing punishment he suffers as a result of his conviction before this Court warrant this Court's action, because, absent said action, the wrongs Petitioner complains of in the instant Petition will never be corrected.

Further, sound reason does indeed exist for Petitioner's failure to seek appropriate relief earlier.  <u>Morgan</u>, 346 U.S. at 512.  Petitioner fought his deportation up to the Second Circuit Court of Appeals.  <u>See</u> Ex. J.  His Petition for Review was dismissed in 2005.  <u>Id</u>.  He was free from <u>any</u> restraint on his liberty from the time he was released from jail, after serving his thirty (30) day sentence in 1999, until 2012, when DHS, unexpectedly decided to execute a more than decade old removal order over a <u>very minor</u> conviction at issue in this Petition.  Had Petitioner been aware that DHS waits decades to execute removal orders, permitting those with removal orders to remain in the United States—allowing them to earn money, buy property, amass Social Security earnings for future retirement disbursements, have children and the like, Petitioner would certainly have fought for his freedom to remain in the United States, which was hindered only by the conviction entered before this Court.  Here, it was only upon his 2012 unexpected arrest that Petitioner actually realized the additional legal determinant that of his 1999 plea.  Shortly after DHS' arrest and removal of Petitioner did he begin the workings on the instant Petition in immediately securing Counsel, who embarked on the review of many documents.

Only complicating Petitioner's attempt to be relieved of his 1999 plea was that, for years, immigration consequences of a guilty plea were not thought of as "direct consequences;" rather, they were "collateral consequences."  <u>Padilla v. Kentucky</u>, 130 S. Ct. 1473 (2010).  What falls within the perimeter of a "direct" consequence has evolved over the years, and, in 2010, the

Supreme Court came to the conclusion that deportation as a result of a guilty plea is indeed a "direct" consequence of the guilty plea and is, quite simply, part of one's sentence:

> We have long recognized that deportation is a particularly severe penalty; but it is not, in a strict sense, a criminal sanction. Although removal proceedings are civil in nature, deportation is nevertheless intimately related to the criminal process. Our law has enmeshed criminal convictions and the penalty of deportation for nearly a century.  And, importantly, recent changes in our immigration law have made removal nearly an automatic result for a broad class of noncitizen offenders.  Thus, we find it "most difficult" to divorce the penalty from the conviction in the deportation context.  Moreover, we are quite confident that noncitizen defendants facing a risk of deportation for a particular offense find it even more difficult.
>
> . . . .
>
> Deportation as a consequence of a criminal conviction is, because of its close connection to the criminal process, uniquely difficult to classify as either a direct or a collateral consequence.

Padilla, 130 S. Ct. at 1473.  The Padilla decision came years after Petitioner's arrest, plea and sentencing before this Court as well as his removal proceedings.  When taken in totality, the pre-Padilla reasoning, the years it took to execute Petitioner's removal and Petitioner's quick action in bringing this Petition before this Court following DHS' execution of its removal order one can only find that there exists sound reason as to why Petitioner acts now.  Nicks, 955 F.2d at 167.

Finally, Petitioner clearly continues to suffer the legal consequences of his conviction that can only be rectified by this Court's issuance of a Writ.  Nicks, 955 F.2d at 167.  Petitioner was deported to Turkey as a result of the plea and sentencing.  He is alone.  Hours away by flight.  No family.  No friends.  No job.  Deportation is permanent.  Deportation is serious. Deportation is automatic after many criminal convictions.  Petitioner's initial deportation and, for lack of a better phrase, continued exile in Turkey amounts to a continuing punishment but for his

1999 conviction.  It is a legal consequence that, for Petitioner, will never end, absent the grant of this Writ.  Id.; see also Padilla, 130 S. Ct. at 1473.

    **a.**    **The Court's Numerous Due Process Deficiencies Throughout Petitioner's Plea and Sentencing and the Continuing Prejudice Petitioner Suffers as a Result of Said Deficiencies Require this Court's to Vacate Petitioner's Plea and the Court's Subsequent Judgment.**

Rule 11 of the Federal Rules of Criminal Procedure (the "FRCP") governs pleas in United States District Court.  Rule 11(b) outlines several items that a court must inform a defendant who is facing criminal prosecution.  See FRCP Rule 11(b).  Rule 11(c) discusses plea agreements, and what attorneys and the court must and cannot do during plea negotiation process.  See FRCP Rule 11(c).  Most of the provisions of Rule 11, including all of Rule 11(b), are mandatory and are note mere discretionary decisions of the court.  See FRCP Rule 11.  The Second Circuit requires district court to strictly adhere to Rule 11.  See U.S. v. Renaud, 999 F.2d 622, 624 (2d Cir. 1993).

A defendant who timely objects to a Rule 11 violation at the trial court is entitled to review of the error unless the government is able to prove that the violation did not affect the defendant's "substantial rights."  U.S. v. Vonn, 535 U.S. 55, 63 (2002).  However, as the Supreme Court stated in Vonn, if a defendant fails to make a proper and timely objection, "the tables are turned on demonstrating the substantiality of any effect on a defendant's rights: the defendant who sat silent at trial has the burden to show that his 'substantial rights' were affected"; this is known as the "plain-error rule."  Id. at 62-63.  To overcome this burden and obtain a reversal of conviction, a defendant must show that: (1) the error was "made"; (2) the error was "plain"; and (3) the error affected the defendant's "substantial rights."  Id.; U.S. v. Olano, 507 U.S. 725, 732 (1993).  The first and second prongs are relatively straightforward, in

that an error must occur and that it must be clear or obvious, with a lack of any reasonable

dispute as to whether or not the error actually occurred.  U.S. v. Marcus, 130 S.Ct. 2159, 2164

(2010); U.S. v. Salim, 690 F.3d 115, 124 (2d Cir. 2012).  The third Olano prong, however, is not

so simple to establish.  Olano, 507 U.S. at 732.  To meet this prong, a defendant must:

> show a reasonable probability that, but for the error, he would not
> have entered the plea.  A defendant must thus satisfy the judgment
> of the reviewing court, informed by the entire record, that the
> probability of a different result is 'sufficient to undermine
> confidence in the outcome' of the proceeding.

U.S. v. Dominguez-Benitez, 542 U.S. 74, 82-83 (2004).

### i.    Judge Acker, Jr., violated Rule 11(b) in His Failure to Obtain a Factual Basis for Petitioner's Conviction.

A trial judge's obligation to determine the factual basis for a guilty plea is a vital

protection that is provided to criminal defendants.  In McCarthy v. U.S., the Supreme Court

noted the following:

> The judge must determine that the conduct which the defendant
> admits constitutes the offense charged in the indictment or
> information or an offense included therein to which the defendant
> has pleaded guilty.  Requiring this examination of the relation
> between the law and the acts the defendant admits having
> committed is designed to protect a defendant who is in the position
> of pleading voluntarily with an understanding of the nature of the
> charge but without realizing that his conduct does not actually fall
> within the charge.

McCarthy v. U.S., 394 U.S. 459, 467 (1969).  To establish the required factual basis, a judge

may rely on "any facts at his disposal," which may or may not include a plea colloquy.  Irizarry

v. U.S., 508 F.3d 960, 967 (2d Cir. 1975).  The Supreme Court, however, has long held a factual

basis must be developed "on the record," a rule endorsed by the Notes of the Rule 11 Advisory

Committee.  Santobello v. New York, 404 U.S. 257, 261 (1971); FRCP Rule 11 Advisory

Committee Note (1974) (Rule 11(f)).  While a judge may rely on a wide array of facts, she still

must place the facts replied upon "on the record at the time of the plea."  U.S. v. Maher, 108 F.3d 1513, 1524-25 (2d Cir. 1997)(emphasis added).

In Petitioner's case, the first two prongs of the three part Olano test– i.e. that the error was made and that it was plain – are easily established.  There exists virtually no discussion on the record of the underlying facts that lead to Petitioner's guilty plea.  Judge Acker did tell Petitioner that he had been arrested for "violating the law of the United States," given the allegation that he was "trying to help Mr. Cakmak . . . to enter the United States illegally yesterday."  (Tr. at 2).  Beyond that, there is nothing more.  (See generally Tr.).  That is the extent of the discussion on the record.  Petitioner was charged with violating Section 1324(a)(2)(A) of Title 8 of the United States Code, which states, in pertinent part that it is a crime for

> [a]ny person who, knowing or in reckless disregard of the fact that an alien has not received prior official authorization to come to, enter, or reside in the United States, brings to or attempts to bring to the United States in any manner whatsoever.

8 U.S.C. § 1324(a)(2)(A).  Judge Acker failed to provide an explanation of the elements of the charge, and did not even try to elicit any discussion of the acts that allegedly led to Petitioner's arrest.  Further, Petitioner received no evidence from the United States Government that would even support his conviction.  The only thing that Petitioner had in hand was an English-only notice of the specific charges levied against him.  Judge Acker only noted at the arraignment and sentencing that he was providing Petitioner and Osman a copy of the document that states the charges that they both faced.  This document was in English, requiring interpreter translation.[1] The document "Judgment and Probation/Commitment Order," however, is the only document

---

[1]  Respondent also asserts in his affidavit that the interpreters did not properly translate the document or discussions had between Respondent and either the CBP officer or Judge Acker, Jr.

from the arraignment that listed the charge Petitioner faced and the only signature on that document is that of Judge Acker; there is no evidence to indicate that Petitioner was even shown the document (of course, Petitioner spoke virtually no English at the time, so even seeing the document would have been essentially useless). Furthermore, Judge Acker failed to engage in any dialogue about the event, even through the interpreter. Instead, mere "yes" or "no" responses were elicited, which Judge Acker found sufficient to sustain the guilty plea.

Additionally, Judge Acker, Jr., without even speaking to Petitioner, should been aware that there was some question as to whether Petitioner's actions fell within the scope of the crime for which they were charged. Because Petitioner was arraigned and pleaded guilty mere hours after the arrest, there is not much documentation that was available for review for Judge Acker at the time of the plea. However, on page 2 of the Form I-213 drawn up soon after the arrest, a CBP Officer (whose name has been blocked out in the documents Petitioner's Counsel has received in response to a Freedom of Information Act Request) indicated that Petitioner "didn't know that [his actions] were against the law, and [was] just helping a friend." While the CBP officer notes that Petitioner admitted to picking his friend up in upstate New York, the officer's report does not directly indicate that Petitioner was aware of the illegality of Mr. Cakmak's entrance into the United States. Petitioner never left the country to pick up Mr. Cakmak, and the report does not state that Petitioner knew of the illegality of Mr. Cakmak's entry: it only indicates Petitioner knew that Mr. Cakmak wanted to leave Turkey because of recent turmoil in that country, that Mr. Cakmak "affect[ed] his illegal entry" and that Petitioner and Osman picked him up in the State of New York. If Judge Acker had made any effort to engage in a discussion with Petitioner, or look at all beyond the Information filed by the United States Attorney, he

would have known there was some question as to whether Petitioner whether or should have known knew of the illegal entry, a fact that would negate the <u>mens</u> <u>rea</u> element of the crime.

. In <u>U.S. v. Andrades</u>, the Second Circuit addressed the serious nature of a failure to put the factual basis of the plea on the record.  In <u>Andrades</u>, a case similar to that at bar, the Court addressed a defendant's plea of guilty in federal court to the charge of conspiracy to distribute narcotics.  <u>U.S. v. Andrades</u>, 169 F.2d 131 (2d Cir. 1999).  There, the court gave the following account of the facts:

> The district court . . . failed to elicit from defendant or the government a statement of the factual basis for the plea.  Instead, the following exchange took place:

> **THE COURT:** All right. Count I of the indictment 97-CR-115 charges, in essence, that on or about August 1, 1996, continuing through August 31, 1996, that you did knowingly, willfully and unlawfully conspire with others to intentionally and unlawfully distribute and possess with intent to distribute cocaine base, in violation of federal law. Is this what you did?

> **DEFENDANT:** Yes, sir.

> **THE COURT:** With respect to Count I, then, of indictment 97-CR-115, how do you plead, guilty or not guilty?

> **DEFENDANT:** Guilty, sir.

<u>Id</u>. at 133.  The Second Circuit held that this exchange was insufficient to establish a factual basis for the guilty plea: at "the time of Andrades' plea, the [District Court Judge] did not elicit any information from defendant or the government.  Instead, the Court merely read the bare bones conspiracy charge from the indictment, which did not identify any coconspirators."  <u>Id</u>. at 133, 136.  The Court was gravely concerned at the lack of evidence supporting the conspiracy's

critical element.  Id.  Like the Andrades defendant, Petitioner was given a "bare bones" instruction of the charge, which did not even include a full reading of the statute on the record. (See generally Tr.).  It is difficult to imagine what this meager summary of the statute could accomplish, particularly given that Petitioner appeared pro se.  He learned nothing when handed a copy of the charges and he spoke no English.  To complicate matters further, he was being read a statute, as only a "layman," through an interpreter who was not an attorney either.  Given these circumstances, Judge Acker should have engaged in a detailed dialogue with Petitioner, on the record, to determine whether Petitioner understood the charges against him.

Indeed, a "reading of the indictment to the defendant coupled with his admission of the acts described in it [is] a sufficient factual basis for a guilty plea, as long as the charge is uncomplicated, the indictment detailed and specific, and the admission unequivocal."  U.S. v. O'Hara, 960 F.2d 11, 13 (2d Cir. 1992) (internal quotations and citations omitted) (brackets in original).  Petitioner, however, was never read a "detailed and specific" indictment and there was no "unequivocal" admission.  The indictment was never put on the record; further, Petitioner never admitted to the underlying acts of the charge.  He simply stated he would plead guilty.

Additionally, one of the defendants asked if either Petitioner or Osman could take both of the charges and accept both punishments while the other went free:  this, alone, should have been a clear indicator to Judge Acker that neither Petitioner nor Osman were aware of the nature of the proceedings.  Perhaps more importantly, this question could have indicated that one of the defendants (and Judge Acker freely admitted he did not know which one was which) believed in his innocence, that the other wanted to take the punishment for the crime, and that at least one of them was pleading guilty simply to avoid dealing with the matter any further.  Regardless, this

statement warranted at least an inquiry from Judge Acker – something he failed to do. Petitioner's substantive rights were clearly violated.  Olano, 507 U.S. at 732.

Likewise, the third prong of the Olano test – that Petitioner's substantive rights were violated – has been met.  The Second Circuit noted that in "the context of a Rule 11 error, this standard requires a reasonable probability that, but for the error, [the defendant] would not have entered the plea."   U.S. v. Garcia, 587 F.3d 509, 520 (2d Cir. 2009).  Further, the Court has noted the particularly severe judicial defect in not establishing a factual basis for the plea:

> A lack of a factual basis for a plea is a substantial defect calling into question the validity of the plea . . . . Such defects are not technical, but are so fundamental as to cast serious doubt on the voluntariness of the plea . . . and require reversal and remand so that the defendant may plead anew or stand trial.

U.S. v. Adams, 448 F.3d 492, 502 (2d Cir. 2006).  Here, is clear that there existed no factual basis for the plea; thus a "substantial defect" occurred.  Petitioner, moreover, has indicated in multiple affidavits that he was not aware of Cakmak's illegality, and as discussed supra, the report from one of the CBP arresting officers in this case indicated that Cakmak was here illegally and that Petitioner tried to drive him from New York to Connecticut, but not that Petitioner was aware of Cakmak's illegality.  This would negate one of the elements of the crime for which he was convicted, which would obviously affect whether Petitioner would have pleaded guilty.  Thus, the third and final prong of Olano's three prong rest has been met.  Olano, 507 U.S. at 732.

Petitioner's position is strongly supported by this Court.  For example, in Tocci v. U.S., this Court confronted a case similar to the one at bar.  Tocci, 178 F.Supp.2d 176 (N.D.N.Y 2001).  In Tocci, the defendant was stopped when entering the United States at the New York border.  In the car's trunk, authorities found an undocumented alien.  Id. at 178.  The defendant

was charged with the same statute as Petitioner.  Id. at 179.  He was arraigned hours later, signed a waiver of right to counsel, and pleaded guilty.  Id.  He was then placed into removal proceedings.  Id.  This Court held that the defendant's substantive rights to due process had been violated, throwing out the guilty plea, given the lack of a factual basis:

> Here, the record reveals no factual basis for Tocci's plea.  The court summarized the charge to Tocci as part of the advice of rights.  Tocci was never specifically asked if he committed the acts alleged and Tocci's general acknowledgment of guilt did not respond, directly or indirectly, to the court's reading of the charge.  Nowhere in the record is there indicated the identity of the alien allegedly transported by Tocci, how the transportation took place, or what occurred when Tocci and the alien arrived at the Port of Entry.  Thus, in the circumstances presented here, the mere statement of the charge to Tocci coupled with a subsequent guilty plea failed to establish the requisite factual basis for the plea.

Id. at 184 (emphasis added).  Here, aside from the identity of the person being transported (who was never identified on the record), all of the parts of the above description apply to the case at bar.  Petitioner was never "specifically asked if he committed the acts alleged," and there was nothing on the record to indicate "how the transportation took place."  Id.  There was also nothing on the record showing what happened "at the Port of Entry."  Id.  This fact is particularly relevant here, as Petitioner was not actually caught at the border, but rather inside the United States, and Cakmak (the allegedly smuggled undocumented alien) was sitting in the backseat in plain view, not hiding in the trunk.  Under these facts, Judge Acker should have had a more detailed discussion with Petitioner than that had in Tocci.  Id.

This multitude of deficiencies on the part of the Court at the arraignment dictates that this Court should find that a sufficient factual basis for the Petitioner's plea was not elicited on the record.  Just as the Tocci Court found that the defendant was denied due process rights, this Court must find that Petitioner was denied the same.  Id. at 184.

> 2.     The District Court did not adequately ensure that Respondent understood the nature of the charges for which he was pleading guilty.

A trial court must determine that a criminal defendant understands the nature of the charges levied against him before accepting a guilty plea.  FRCP Rule 11(b)(1)(G) states that:

> [b]efore the court accepts a plea of guilty . . . the defendant may be placed under oath, and the court must address the defendant personally in open court. During this address, the court must inform the defendant of, and determine that the defendant understands, . . . the nature of each charge to which the defendant is pleading.

FRCP Rule 11(b)(1)(G).  The Second Circuit has further clarified what is required by this provision.  First, in terms of informing the defendant, the Maher Court noted that to meet the requirements of Rule 11(b)(1)(G), "[t]he court may . . . inform the defendant of the nature of the charges by describing the elements of the offense in the court's own words . . . [o]r . . . [by] provid[ing] that information by reading the indictment to the defendant where the pertinent count spells out the elements of the offense and the circumstances indicate that this will be sufficient."  Maher, 108 F.3d at 1521.  When a defendant's admissions indicate a lack of understanding of the charges he faces, the Rule may also be satisfied when a defendant acknowledges that he read, understood and discussed the contents of the document with an attorney. See U.S. v. Parkins, 25 F.3d 114, 118 (2d Cir. 1994).

It is not the mere recitation of the charges that is important; rather it is the understanding of them that is the underlying purpose of the Rule.  In McCarthy, the Supreme Court refuted a government argument that a guilty plea was valid because the defendant desired to plead guilty and he was instructed as to the consequences of his plea:

> We cannot accept this argument, [because, inter alia] the Rule is intended to produce a complete record at the time the plea is entered of the factors relevant to this voluntariness determination

> . . . .
> . . . .
> . . . .
>
> By personally interrogating the defendant, not only will the judge
> be better able to ascertain the plea's voluntariness, but he also will
> develop a more complete record to support his determination in a
> subsequent post-conviction attack
> . . . .
> . . . .
> . . . .
>
> Moreover, because a guilty plea is an admission of all the elements
> of a formal criminal charge, it cannot be truly voluntary unless the
> defendant possesses an understanding of the law in relation to the
> facts. To the extent that the district judge thus exposes the
> defendant's state of mind on the record through personal
> interrogation, he not only facilitates his own determination of a
> guilty plea's voluntariness, but he also facilitates that determination
> in any subsequent post-conviction proceeding based upon a claim
> that the plea was involuntary. Both of these goals are undermined
> in proportion to the degree the district judge resorts to assumptions
> not based upon recorded responses to his inquiries. For this reason,
> we reject the Government's contention that Rule 11 can be
> complied with although the district judge does not personally
> inquire whether the defendant understood the nature of the charge.

McCarthy, 394 U.S. at 465-67 (internal quotations and citations omitted) (emphases added).

Given the importance of these requirements, the Second Circuit requires strict adherence to Rule

11. See, e.g., Parkins, 25 F.3d at 117; Renaud, 999 F.2d at 624; U.S. v. Lora, 895 F.2d 878, 880

(2d Cir. 1990).

Again, we must apply the three prong Olano test. Olano, 507 U.S. at 732. The first two

prongs of Olano are easily met – i.e. that error was made and that it was plain. Id. As discussed

supra, Judge Acker did not adequately advise Petitioner of the charges against him. Despite the

plain language of the Rule, there is no evidence that indicates that Petitioner was sworn in. Only

the interpreter was sworn in. Petitioner was not personally addressed, except for the final "yes"

on the guilty plea.  There was no discussion of the elements of the charge, other than a bare summary of the statute, which failed to mention the mens rea element of the crime charged.

Even assuming, arguendo, that the Court adequately notified Petitioner of the charges, there exists nothing to indicate that Petitioner understood the charges.  Despite the principles established in McCarthy, no complete record was developed to establish Petitioner's understanding of the proceedings; he mostly gave "yes" or "no" answers, and the question about whether one person could serve both jail terms (it is not clear from the record whether Petitioner or Osman asked the question) exhibits a lack of awareness of the nature of the criminal charges and proceedings.  McCarthy, 394 U.S. at 465-67.  Judge Acker did little, if anything, to "expose[] the defendant's state of mind on the record";  indeed, very little can be ascertained about Petitioner from the record.  Id.  One may only assume that Judge Acker determined Petitioner's understanding of the charges (along with the factual basis of the conviction) through the type of "assumptions not based upon recorded responses to his inquires" that the Supreme Court has strongly denounced.  McCarthy, 394 U.S. at 465-67.

Finally, any notion that the record indicates Petitioner understood the charges against him is further belied by the absence of legal representation as well as an interpreter who did little interpreting.  At one point during the arraignment, Judge Acker asked the interpreter if he had a "chance to go over these consent forms with Petitioner.  (Tr. at 4).  While the interpreter could provide a literal translation of the words on the page, there was a complete lack of any person who was legally qualified to explain the meaning or implications of those words.  Petitioner's lack of counsel at the arraignment should have further prompted Judge Acker to engage in a meaningful discussion with Petitioner about the charges.  Just as the McCarthy Court rejected the

argument that a court need not "personally inquire [as to] whether the defendant understood the nature of the charge," this Court must do the same.  McCarthy, 394 U.S. at 465-67.

The third Olano prong – i.e. prejudice on defendant's substantive rights – is satisfied. Olano, 507 U.S. at 732.  While McCarthy did not expressly address substantive rights, it did find that the district court's failure there to adhere to Rule 11 "deprive[d] the defendant of the Rule's procedural safeguards that are designed to facilitate a more accurate determination of the voluntariness of his plea. . . . It is, therefore, not too much to require that . . . district judges take the few minutes necessary to inform [defendants] of their rights and to determine whether they understand the action they are taking."  McCarthy, 394 U.S. at 471-72.  The Second Circuit has since addressed the issue of substantive rights.  In Andrades, the Second Circuit concluded that

> [t]he district court's effort to ensure that Andrades understood the nature of the conspiracy charge was limited to Judge Scullin reading the charge and eliciting a "yes, sir" from Andrades. The district court elicited a similar response from Andrades' lawyer regarding Andrades' understanding of the plea agreement.  Judge Scullin did not describe the elements of the offense in his own words to Andrades.  The indictment that Judge Scullin read did not outline the elements of the offense or relevant circumstances. Furthermore, Judge Scullin did not elicit explanations of the charges from the government.  Defense counsel advised the court that he had discussed the plea agreement with his client, but that document did not describe the elements of conspiracy or relevant circumstances.

Andrades, 169 F.3d at 135.  These deficiencies, the Second Circuit held, clearly violated the defendant's substantive rights, warranting the reversal of his conviction.  Id.

Here, Judge Acker did not take the "few minutes" to ensure that Petitioner understood the nature of the charges against him.  McCarthy, 394 U.S. at 471-72.  Moreover, he was satisfied with mere "yes" or "no" answers and failed to discuss, in any detail, the "relevant circumstances" of the alleged crime.  Id.  Further, he did not "elicit explanations of the charges

from the government." <u>Andrades</u>, 169 F.3d at 135.  Petitioner had no attorney present to explain anything to him at the time of the plea.  Had an attorney been present, then, yes, some of these deficiencies may have been cured.  For Petitioner, unfortunately, he did not have counsel, he spoke no English, he agreed to plead guilty only hours of his arrest for his alleged violation of a federal charge that would lead to his ultimate removal from the United States.  Petitioner deserved more.  The notion of due process, more importantly, demands more.  Petitioner's substantive rights have been violated, just as those same rights were violated in <u>Andrades</u>.  <u>Id</u>. Given this, this Court must grant this Writ and vacate Petitioner's sentence and plea.  <u>Id</u>.

## IV.   CONCLUSION

For the reasons set forth herein, Petitioner, by and through his Counsel, respectfully requests that this Court enter an Order granting this Petition and vacating his plea and sentence.

Respectfully Submitted:

**BAURKOT & BAURKOT**

Dated:   <u>March 27, 2013</u>

Raymond Lahoud, Esquire
227 South Seventh Street
Post Office Box 801
Easton, PA  18044-0801
P:      484-544-0022
F:      610-810-1878
E:      rgl@bmblawyers.com

*Attorneys for Petitioner*

25